Kent J. RUBENS *v.* Lilian B. HODGES

91-206                                      837 S.W.2d 465

Supreme Court of Arkansas
Opinion delivered September 28, 1992

*Sloan, Rubens & Peoples*, by: *Kent J. Rubens*, for appellant.

*Hilburn, Calhoon, Harper, Pruniski & Calhoun, Ltd.*, by: *Bob R. Brooks, Jr.*, for appellee.

ROBERT H. DUDLEY, Justice. Lillian Hodges and Lillian Morris were candidates for Justice of the Peace, District 3, Crittenden County in the November 6, 1990, general election. Lillian Morris died two weeks before the election, but still received seven votes more than Hodges. The Crittenden County Election Commission certified the decedent as the winning candidate. Lillian Hodges apparently realized that when a deceased or disqualified candidate wins an election, the votes received by the deceased or ineligible candidate are not void, but are effectual to prevent the opposing candidate from being chosen. *Davis* v. *Holt*, 304 Ark. 619, 804 S.W.2d 362 (1991); *see also* Annotation, *Elections — Dead or Disqualified Candidate*, 133 A.L.R. 319 (1941); Ark. Code Ann. § 7-5-315 (7) (Supp.

1991), (enacted after this suit arose). Consequently, she filed an election contest.

In her complaint, Hodges alleged that the voters of one ward were entitled to vote on the District 3 position, but that the ballots used in that ward did not allow voters to vote in that particular race. (Subsequent arguments revealed that one of the voting machines in the ward broke down and the rest of the votes were cast with the use of absentee ballots that did not contain this race.) She alleged, "Of the 23 people voting in Precinct 4-3 . . . at least 9 wanted to vote for Lillian B. Hodges but were unable to do so since the race was not on their ballot." In addition, she alleged that the voters in another ward voted with the use of two voting machines and that the District 3 race was not listed on one of the machines. (Subsequent statements to the trial court showed that this ward is divided into two justice of the peace districts, one voting machine contained the race in District 3 and the other machine contained the race in the other district, and the poll workers directed some voters to the wrong machines). She alleged, "Seven voters properly registered in Precinct 5-2 . . . were directed to the voting machine not containing Justice of the Peace District 3 race on it. These seven voters wanted to vote for Lillian Hodges." She asked that the total of sixteen votes be counted by the trial court and that she be declared the winner. The contestant attached affidavits of the sixteen people to her complaint.

The complaint named the Crittenden County Board of Election Commissioners as defendants. The election commission answered and said that "representatives for Lillian B. Hodges should be required to respond." On January 15, 1990, the Crittenden County Quorum Court, by resolution, declared a vacancy in the position since the election commission had certified the decedent as the winner. On February 13, 1991, the contestant, by amending her complaint, asked that the quorum court resolution declaring a vacancy "be set aside and held for naught."

Contestant Hodges subsequently filed a motion for summary judgment and for a writ of mandamus. On May 24, 1991, the trial court granted summary judgment, and ordered the election commission to certify Lillian B. Hodges as the winner and the

Quorum Court to set aside its resolution declaring a vacancy. The election commission appeals from the summary judgment and raises a number of issues. We set out those issues, but do not rule on all of them because issues of material facts remain unresolved. Additionally, the complaint did not state facts sufficient to contest the election and, because this is an election contest, it cannot now be materially amended.

The election commission first argues that the trial court erred in permitting the election contest to be tried without naming a representative of the successful candidate as a party defendant. Clearly, we have said that an election contest is an adversarial proceeding between a successful candidate and an unsuccessful candidate. *McClendon* v. *McKeown*, 230 Ark. 521, 323 S.W.2d 542 (1959). However, in this case the prevailing candidate is deceased and cannot personally be made a party. Even so, the governing statute apparently contemplates that the contestant should be able to contest the election. Ark. Code Ann. § 7-5-801 (1987) and *see Cain* v. *Carl-Lee*, 171 Ark. 155, 283 S.W. 365 (1926) (where, under a prior but comparable act, we held that an election contest is not abated when the contestee resigns from office). The adverse interest to be represented is neither the civil rights nor the property rights of the deceased, but rather the political rights of the majority of the voters. *See Walls* v. *Brundage*, 109 Ark. 250, 160 S.W. 230 (1913) (for discussion of these rights in a different context). The contestant named only the election commission as the party defendant in the original complaint. In an *election contest*, as distinguished from an action seeking to *void an election*, we have said the election commission is not the proper party defendant, *Henry* v. *Stuart*, 251 Ark. 415, 474 S.W.2d 165 (1971), although it is a proper nominal defendant. The reason is the commission's function is to promote fair elections, to act in a disinterested manner in disputes between candidates or their representatives, and to take neither side in a contest.

An election contest is a statutory proceeding. *Reed* v. *Baker* 254 Ark. 631, 495 S.W.2d 849 (1973). We have said that election contests are special proceedings and are subject to Ark. R. Civ. P. 81, "which exempts from the applicability of the rules 'those instances where a statute which creates a right, remedy or proceeding specifically provides a different procedure in which

event the procedure so specified shall apply.' " *Hanson* v. *Garland County Election Comm'n*, 289 Ark. 367, 712 S.W.2d 288 (1986). There is no statute governing who is the proper party defendant in this particular situation, and while we could determine who the proper party was in order to make the election contest statute have meaning, *see Henry* v. *Stuart*, 251 Ark. 415, 474 S.W.2d 165, it is not necessary for us to do so because we reverse for a different reason. While we do not decide the issue, we do invite the General Assembly to determine whether it wishes to enact a statute to govern the procedure for future cases such as this.

The election commission also contends that the trial court erred in the procedure by which it declared Lillian Hodges the winner of the contest. Again, we do not decide the issue, and discuss it only to show that there is a body of law on the subject that was not brought to the attention of either the trial court or this court because the political rights of the majority of the voters were never fully and adequately represented. Lillian Hodges argued that the trial court could count votes for her that were never cast at the election and her argument was based upon an inference, not the holding, in *Files* v. *Hill*, 269 Ark. 106, 594 S.W.2d 836 (1980). If this case had been fully contested on an adversarial basis, it might have been developed that we have no statute providing for such a remedy, and in *Watson* v. *Gattis*, 188 Ark. 376, 65 S.W.2d 911 (1933), in discussing the language of an earlier, but comparable, constitutional provision, we wrote, "The elector himself would not be permitted to testify that, having failed to vote specifically for any candidate for any particular term, he nevertheless intended that his ballot should express his assent. . . . " Many other jurisdictions have addressed the issue, and the general rule is that while the elector may testify that he was wrongfully prevented from voting, and such testimony may be used to void the entire election, the elector may not testify that he intended to vote for a particular candidate. *29 Elections*, C.J.S. § 281 (1965).

In *Pawlowski* v. *Thompson*, 264 N.W. 722 (S.D. 1936), the plaintiff in a successful election contest introduced evidence that ten wrongfully excluded voters would have voted for him. The court, in reversing the trial court's decision, said:

We think it clear that they should not now be

> permitted to come in and say that they were not permitted to vote, but had they been, they would have voted for the plaintiff and thereby change the result of the election as declared by the election board. It is well established that ballots offered but not received cannot be made available for either candidate.

*Id.* at 724. The court went on to quote Mechem on Public Officers:

> A voter who did not vote, though legally entitled to do so, and although he did not vote because he was unlawfully prevented, can not afterwards be permitted to testify that he would have voted for a certain person, notwithstanding that the lawful votes so excluded would, if cast as intended, have changed the result.

> The election is to be decided by the number of legal votes actually cast, and not by ascertaining what might have been cast. The election may be held invalid because of the suppression of legal votes, but public policy forbids that, after it is known just how many votes are necessary to change the result, it should be permitted to change it upon the present statement of voters as to their past intentions.

*Id.* (quoting Floyd R. Mechem, *Public Offices and Officers* § 237 (1890)).

The leading case on the subject appears to be *Pennington* v. *Hare*, 62 N.W. 116 (Minn. 1895), and that court said that to allow the voter to testify as to his intention "would be an uncertain and dangerous experiment." *Id.* at 117. The court noted that any attempt to determine the voter's intent would simply be speculation and could lead to some voters selling their votes to alter the outcome of a close election. Although the court acknowledged the hardship on the individual who loses his vote, the court viewed the individual's interest to be outweighed by the public interest in avoiding uncertainty in elections. *Id.*

More recently, the Arizona Court of Appeals addressed the issue and held that "one cannot be allowed to testify as to the candidate for whom he would have voted for the purpose of increasing the votes for that candidate." *Babnew* v. *Linneman*, 740 P.2d 511, 515 (Ariz. Ct. App. 1987). *See also Kirby* v. *Wood*, 558 S.W.2d 181 (Ky. Ct. App. 1977), *rev'd on other grounds sub*

*nom. Wood* v. *Kirby*, 566 S.W.2d 751 (Ky. 1978); *Duncan* v. *Willis*, 302 S.W.2d 627 (Tex. 1957); *Whatley* v. *LaSalle Parish Sch. Bd.*, 99 So. 603 (La. 1924); *Martin* v. *McGarr*, 117 P. 323 (Okla. 1910); *Young* v. *Deming*, 33 P. 818 (Utah 1893). We have not found any cases to be contrary, although one case, *Helm* v. *State Election Bd.*, 589 P.2d 224 (Okla. 1979) must be distinguished. In that case the panel on a voting machine was configured so that if the voter pulled the lever for one candidate, a vote was actually cast for another. Under those conditions, the Supreme Court of Oklahoma allowed voters who actually voted in the race to testify for whom they were attempting to vote. Again, however, we do not decide whether the trial court erred in counting votes that were never cast and declaring Lillian Hodges the winner on such a basis; rather, we point out that the majority of voters were never truly represented, and the general rule of law was not brought to the attention of the trial court. Another troubling aspect of this proceeding, which was akin to an ex parte proceeding, is that even if the intent of disfranchised voters can be counted, such votes were not counted for the decedent here.

The election commission also argues that the trial court erred in granting summary judgment and asks us to remand the case and require that someone be appointed to represent the interests of the majority of the voters. We agree that the summary judgment must be reversed, but we dismiss, rather than remand.

█  The decedent was certified by the election commission as winning by seven votes. In her complaint and motion for summary judgment, the contestant alleged, and attached affidavits to the effect that, of the twenty-three people voting in the ward where absentee ballots were used, at least nine intended to vote for her but were unable to do so. It is obvious that there were fourteen other people who might have intended to vote for the decedent but were unable to do so. Thus, neither the complaint nor the motion alleges or shows that the votes of citizens who were disfranchised in this ward would have changed the result of the election, and such an allegation is necessary. *Mason* v. *Peterson*, 238 Ark. 1069, 386 S.W.2d 486 (1965). She additionally alleged that there were seven persons who would have voted for her in the ward in which poll workers referred some voters to the wrong voting machine. However, neither the complaint nor the motion specifies how many other voters were directed to the wrong voting

machine that would have voted for the decedent. Thus, the complaint does not contain an allegation, nor do the affidavits attached to the motion for summary judgment show, that if the votes of all the disfranchised citizens were counted the result of the election would have been different. Thus, there remains an issue of material fact, and the summary judgment must be reversed. *See* Ark. R. Civ. P. 56(c). In addition, the right to contest an election is limited to one who claims to be the rightful winner of the contest. That person must plead that he or she received the majority of the votes. *Mason* v. *Peterson*, 238 Ark. 1069, 386 S.W.2d 486 (1965). Because the contestant in her complaint failed to allege facts necessary to contest the election and have herself declared the person with the most votes, it is now too late for her to do so. *Spires* v. *Compton*, No. 91-320 (Ark. September 21, 1992). Accordingly, we reverse and dismiss.

CORBIN, J., not participating.